## In re CHARGE TO GRAND JURY.

(District Court, S. D. Georgia, E. D. February 27, 1908.)

1. INTERNAL REVENUE—SPECIAL TAX ON LIQUOR DEALERS—ENFORCEMENT BY COURTS.

While the cardinal purpose of the provisions of the internal revenue law imposing special taxes on dealers in liquors is the raising of revenue for the United States, the federal courts may properly, in the exercise of the powers vested in them, rigidly enforce the penalties provided for a violation of such law, for the secondary purpose of aiding in the enforcement of the laws of a state regulating or prohibiting the sale of liquors.

2. SAME—PERSONS SUBJECT TO TAX—MEMBERS OF ILLEGAL CLUBS.

Under the statute law of Georgia which makes it unlawful for any person to sell or barter either directly or indirectly, or to keep or furnish at any public place, or to keep on hand at any place of business, intoxicating liquors, a municipal corporation cannot lawfully license or charter a so-called "locker club" which, in fact, sells or furnishes liquors to its members, and such illegal charter is no protection to its members, each one of whom, who by his money, name, or patronage contributes to its support and maintenance, is a retail liquor dealer within the internal revenue law of the United States, subject to special tax as such and to the penalty imposed for carrying on the business without payment of such tax where a single tax stamp only is taken out in the name of the club.

After an eloquent historical address in relation to the laws regulating the manufacture and sale of intoxicating liquors, both state and national, and an interesting and instructive disquisition on the effect of the use of liquor on the negro population of the South and of the causes leading to the rights and enforcement of prohibitory laws in the South, more particularly in the state of Georgia, the judge continued his charge to the jury as follows:

SPEER, District Judge. It is not surprising, gentlemen, that with such convictions the courts, if they appreciate their duty, must with the utmost apprehension regard every effort to nullify, set aside, or evade those laws, made for the salvation of the people. Determine, then, if you can, my emotions, with the knowledge of such facts as those I have just recited, when this further knowledge came to me through the report of the United States marshal on yesterday:

"On Saturday, February 22d, I visited the 'locker club' known as the 'Alpine Club,' on the corner of Jefferson and Bryan streets, in Savannah, Ga. I found that this club was operated in a small room about 16 feet square on the first floor in a building which was recently a barroom. They had moved the bar fixtures out of the former barroom into an adjoining room, and this

last-named club was the clubroom. There were two entrances to the club—one through a door from Jefferson street, and one through the old barroom. Both these doors were locked, but, when I knocked on the door, a man named Kolman opened the door. I introduced myself to him as United States marshal, and told him I wanted to see his revenue tax stamp and his charter. He agreed to show them to me, and we went inside. When we reached the inside or clubroom, I found about 15 or 20 negroes in the place; two of them sitting in one corner in a state of complete intoxication. The place was furnished with regular bar fixtures. A white woman, who I was informed was Kolman's wife, was tending bar, serving drinks to three or four colored men who were standing at the bar. As I reached the inside, these men were just setting the glasses upon the counter, apparently having just drunk, and the white woman cleared them away, together with a bottle of whisky which was sitting on the counter, from which the negroes had doubtless poured their drinks. There were five or six negroes sitting at a table inside the clubroom, each with a glass of whisky before him."

It seems from the marshal's report that the manager of the "Alpine Club" had been previously in business. The marshal continues:

"In January they elected a new president and vice president of the old Alpine Club, both colored, and Kolman, the white man, is secretary and treasurer. Kolman showed us a contract he had with the old club, which recited the fact that the Alpine Club had no capital, and Kolman agreed to furnish the clubrooms, lights, etc., and, in consideration of the same, he was to receive all profits made from the sale of liquors, etc. Since opening the new Alpine Club, the officers of the same have agreed to pay him $75 per month to manage and operate the same. Kolman stated that he did not know how many members he had, as his lawyer had his membership book. He said they took in members whenever they had as many as four or five applications. On his desk I saw as many as 75 or 100 applications for membership. These applications for membership read as follows: 'To the Officers and Members of the Alpine Club, Savannah, Ga. Gentlemen: I hereby tender this my application for membership in your club, promising, if elected, to abide by all rules and regulations. Respectfully, ————.' In most cases these applications were not dated, and were signed by cross-marks, which were not witnessed. I also saw an order blank on the manager's desk, which read as follows: 'Savannah, Ga., Feb. 21, 1908. To the Superintendent of the Alpine Club, City. Dear Sir: Kindly order for my account three ½ pints of rye, for which I enclose $1. In placing this order, you are acting as my agent, and the said articles are for my personal use. Please have the same delivered to me by interstate shipment and notify me. Respectfully, C. Golden.' I was in this locker club possibly a half hour, and in that time there must have been 35 or 40 colored men that came in, some of whom had keys and let themselves in, while others of them knocked on the door for admission. I saw no lockers anywhere. Mr. R. B. Thomas, special United States gauger, who accompanied me, went behind the counter, and said he saw three small lockers under the counter, each one about large enough to hold a quart bottle of whisky.

"Respectfully submitted. George F. White, United States Marshal."

From the officers of the Internal Revenue Bureau it has been reported to me that there are 1,184 negro members of the Alpine Club. There are others, many others, which will be brought to your attention. By their genteel membership, by their beautiful and brilliant fixtures, or by their gleaming cut glass, some of them may produce an illusion which is inconsistent with the possibility of vice or crime. I believe there are 15 of these "locker clubs," as they are termed, in this community. Eight of them have providently gone out of business since certain admonitory remarks made by this court during the last month. The others might perhaps with some judiciousness have imitated their

example. An illustration as to these locker clubs may be found in the letter following:

"Captain G. B. Pritchard, Acting City Treasurer, City.

"Dear Sir: Upon payment of the required tax, please issue to the Olympia Club, Chris Evans, president, secretary and treasurer, a locker club license, at 42–44 Barnard street.

"Very respectfully,                                    [Signed by Mayor.]"

Notwithstanding the numerous qualities of Chris Evans, "President, Secretary, and Treasurer," the mayor, who is a charming gentleman, whose friendship I cherish and covet, had no right whatever to issue this locker license, and it possesses no validity in view of the general law of the state of Georgia. That law is as follows:

"Be it enacted by the General Assembly of the state of Georgia, and it is hereby enacted by authority of the same, that from and after the first day of January next after the passage of this act, it shall not be lawful for any person within the limits of this state, to sell or barter for valuable consideration, either directly or indirectly, or give away to induce trade at any place of business, or keep or furnish at any other public places or manufacture or keep on hand at their place of business any alcoholic, spirituous, malt, or intoxicating liquors or intoxicating bitters or other drinks which, if drunk to excess, will produce intoxication. and any person so offending shall be guilty of a misdemeanor, and shall be punished as prescribed in section 1039 of the Pen. Code 1895 of Georgia. * * * "

It is, however, said that because in the tax act the state imposes a tax of $500 on what are termed "locker clubs," this justifies the authorization of such clubs and the issuance of such licenses. We turn to that clause of the tax act upon which such argumentative persons rely. We find that it reads as follows:

" * * * In addition to the ad valorem tax on real estate and personal property, as required by the Constitution and provided for in the preceding section, the following specific taxes shall be levied and collected for each of said fiscal years: * * * Upon every club, corporation or association of persons who shall keep or permit to be kept in any room or place, or in any place connected therewith directly or indirectly, in which the members of such club, corporation or association assemble or frequent, any intoxicating liquors, the sum of five hundred dollars; provided, that nothing in this section shall be construed to license or permit the keeping of any intoxicating liquors, in any place now prohibited by law or which may hereafter be prohibited by law."

This means merely that if a man sets up a blind tiger in violation of the general state law, which I have just quoted, in addition to the other penalties, the state of Georgia can collect from him a special penalty of $500. There is no act of authority whatever to any one to violate the general state law. No municipal mandate whatever can have any force or effect when it is plainly obnoxious to the general laws of the state. As to these locker clubs, the law does not distinguish between their high condition or their low estate.

If the charters are in violation of state law, or are null and void for any reason, and therefore do not authorize these locker clubs to carry on the business of retail liquor dealers, and if, under the cover of such charters, individuals become members of an association, and, by membership dues or otherwise, pay their means for the purchase and maintenance of its place of business, its paraphernalia, and its liquors,

which are dealt out to them as called for, they each become liquor dealers in contemplation of both state and national law. The presence of a pigeon hole either under or over the bar will not avoid the penalties of the law.

Now, the statute which defines and punishes any violation of the law is found in section 16 of the act of February 8, 1875 (18 Stat. 310, c. 36), amending section 3242 of the Revised Statutes (U. S. Comp. St. 1901, p. 2095), and is as follows:

" *   *   * Any person who shall carry on the business of a rectifier, wholesale liquor dealer, retail liquor dealer, wholesale dealer in malt liquors, or manufacturer of stills, without having paid the special tax as required by law  *   *   * shall, for every such offense, be fined not less than $100, nor more than $5,000, and imprisoned not less than thirty days nor more than two years."

The offense of carrying on the business of a retail liquor dealer without paying the special tax as required by law is a misdemeanor. In a misdemeanor there are no degrees or grades of offense. Each man who participates in its successful completion is himself a complete offender. This is inevitable, because there is neither lawful charter nor lawful partnership or association. The men who deliberately sign agreements, announce themselves as members, authorize agents to buy, to keep on their account, to dispense the liquors, who pay in their money to support the establishment, and who consume and enable others to accumulate and consume these liquors, or any part thereof, whether furnished by one or other members of the association, are retail liquor dealers in contemplation of law. The law will look through the form to the substance of the offense. It will look at the entire transaction. It will not stop and scrutinize narrowly one stingy gentleman, who in grim exclusiveness will consume the liquid delights of his favorite brand from his own alleged locker. It will consider every evidential feature as described by the internal revenue officers or otherwise is put in proof, and determine whether, in fact, a man has so acted as to make himself a retail liquor dealer, or to keep up the business of a retail liquor establishment, where liquors can be freely disposed and dispensed, and at the same time so narrowly handle his own skirts as to keep them free from the stain of legal condemnation. If his money, his membership, his liquor, his name, his influence, his participation, aided to carry it on, and if he is not lawfully authorized to do these things, he is in the business with the others, and the law treats him as a retail liquor dealer.

It is true that the cardinal object of the national law is to enforce the collection of taxes for the federal treasury. I have never yet, however, been able to appreciate the fact that it is improper so to use lawful powers within one's jurisdiction, as to accomplish the direct purpose for which they were enacted, and at the same time do all one can for the general welfare of the people, and, if possible, for the elevation of their moral status. The United States courts can do great good toward the solution of the great problems before our people, which engage the thoughtful hours of every reflecting and patriotic man. While a certain class of thinkers, to an extent hide-bound, deny such powers to the United States courts, I observe that sometimes they are

very glad to call on us for help. Some of them may not do so in re-' gard to the locker clubs. You will doubtless recall the stanza of Tam O'Shanter: ·

> "Inspiring bold John Barleycorn,
> "What dangers thou canst make us scorn."

While this is possibly true, the high-minded men, who for momentary indulgence, and possibly with momentary indignation at the policy of the state, have entered into these locker clubs, will, I am convinced, soon see that the part of good citizenship will guide them to their abandonment. Already the most astounding benefits have been experienced by the people at large from the prohibition law. Why, even the dumb brutes, who have been subjected to the service of man, would, if they could, thank God for prohibition. The hard driving and neglect of the drunken negro, and the drunken white man as well, have been succeeded by kindliness and attention. The state of Georgia in 12 months will gain incalculable advantages in the improvement of stock alone, because drunkards no longer handle and drive them. A prominent mill man in Macon, one of our best citizens, assured me that, while heretofore he could not get his men to work before Tuesday or Wednesday after the Saturday night debauch, now that whisky is gone, bright and early Monday morning they are at the engine, the spindle, and the loom. Labor, which was almost impossible to obtain through the rural districts, is now plentiful, and the work has just begun. Little more than a year ago I heard experienced contractors complain that many of their laborers would work only a day or two in a week to obtain enough money for support and the small amount of food consumed, and then quit work until the money was gone. The police courts of such great cities as Macon, Augusta, and Atlanta, when contrasted with their former methods, have practically gone out of business. The offenses formerly engaging their attention are now not committed. This will be found true in the superior courts and the county courts throughout the state of Georgia. Where a week or two weeks of the people's time and money were expended upon the criminal docket, it will not bear out my experience if they do not finish in a day, or two days. I well remember when I was a young Solicitor General that in one county in my circuit the sale of liquor was forbidden. Early Monday morning the tall, stalwart, clear-eyed people, cleanly, manly, quiet, temperate, and discreet would gather in the county seat. By the second day we were through with the criminal docket. In an adjoining county, with the same lands, the same climate, and the same people, often of the same families, the sale of liquor was present. The faithful judge was prompt to call the criminal docket at the first moment, but it was usually true that, with all the energy and dispatch of its officers, at least two weeks were required for its disposition. The looks of the people were different. In one county there was the temperate life, where hope elevates and joy brightens. In the other the countenances of the people were sodden. There was the bleared and bilious eye, the lurid visage, the unshorn jaws, and not unfrequently the unbathed person, which dispelled in the court an

odor that in the language of John Wesley on one occasion "did not smell like balsam." In a short time after the abolition of the liquor traffic, in the noble city of Athens, I have seen the drunkard reformed and reconsecrated to the duties of manhood, his dingy house repainted, his fences rebuilded, his once pathetic, bare-foot, dirty little children clean, well-clothed, well-shod, and well-fed, with bright eyes hastening to school, and the wife, whose once worn and wasted features, in the happiness and pride of his resurrection, had regained the loveliness and charm of youth.

I have not discussed the moral phases of this great question, but merely those which seem to be legal and political. If the laws which the people of our state have enacted are enforced, the chief happiness to inure to those we love is the consciousness that henceforth, if we expel the demon of the still from our borders, confidence and peace will reassume their place in happy homes among those dear objects of our love, dearer to us "than are the ruddy drops that visit our hearts." Once there was within my own memory no such thing in all the borders of this Southland as that unspeakable crime, the bare mention of which will stir a fever in the blood of age, and make the infant's sinews strong as steel. It will disappear from our civilization when the brain of the docile African, even of the lowest order, is no longer infuriated and rendered careless or desperate of consequences by the drink he absorbs. In his furtive wanderings on the lonely roads, or in his solitary lair in the forest, the poisonous cardiac stimulant drives the blood of the savage in swift pulsations to his compressed or maddened brain, and then—no matter how desperate the chance or certain of detection—the crime is committed. This it is which has ranked the people of Georgia, save perhaps in one or two great cosmopolitan cities, in the serried ranks of those who have determined that the sale and furnishing of liquor shall stop within our borders. The politicians did not do it. They framed a platform for local option. The representatives of the people stamped the planks of this platform into nothingness. It is a revolution, and it will not stop with Georgia, nor do I believe it will stop with the South. Even now the senior senator of this state has invoked the powerful aid of Congress to fulfill the purpose of this people. Lives will become irradiant by its presence. Gentle woman reassumes her rightful station as regnant queen. The prayers of good men in great cities, amid the dim religious light of great churches, are heard that it may prosper. And in country churches, in the shades of gigantic oaks, or amid the sighing pines, the prayers and the song worship of the simple, earnest servants of the old-time religion, as they roll away amid the aisles of the forest, are a thank-offering of a long suffering and a sorely troubled people that strong drink has been forever banished from our state.

I have confidence, gentlemen, that you, who are selected from the thoughtful, the conscientious, the reflecting, the home-loving, the God-fearing, the patriotic people of Georgia, will give such consideration to this great topic as will advance the cause of temperance, justice, right, and home.